UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SAMUEL BROWNRIDGE,

                    Petitioner,

        -against-                                REPORT &
                                                RECOMMENDATION
                                                06-CV-6777 (RJD)(SMG)

DAVID L. MILLER, Superintendent,
Eastern Correctional Facility,

                    Respondent.
-------------------------------------------------------------X
GOLD, S., *United States Magistrate Judge*:

## <u>Introduction</u>

       Petitioner, Samuel Brownridge ("Brownridge"), brings this petition for a writ of habeas

corpus *pro se* pursuant to the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), 28 U.S.C. § 2254.  Brownridge was convicted after trial in New York Supreme

Court, Queens County, of intentional and felony murder.  In his petition, Brownridge challenges

his conviction on two grounds: (1) denial of a constitutionally fair trial based upon improper

comments made during the prosecutor's summation; and (2) ineffective assistance of trial

counsel.[1]  *See* Petition for Writ of Habeas Corpus ("Habeas Pet.") 6-7, Docket Entry 1.  Chief

United States District Judge Raymond J. Dearie has referred the petition to me for a report and

recommendation.  Docket Entry 28.  For the reasons stated below, I respectfully recommend that

Brownridge's petition be denied.

---

[1] In an addendum to his petition, Brownridge raises a third challenge to his conviction on the ground that newly
discovered evidence establishes that he is actually innocent of the crimes with which was charged.  *See*
Addendum to Petition for Writ of Habeas Corpus ("Habeas Add.") at 4, Docket Entry 20.  As discussed below,
however, actual innocence is not an independent ground for habeas relief.  *See Herrera v. Collins,* 506 U.S. 390, 400
(1993).

**Background**

A.     The Evidence at Trial

     i.   *The People's Case*

The prosecution's case rested in large part on the testimony of two eyewitnesses. The first, Kevin Boatwright, testified that, on the evening of March 7, 1994, he was walking on Mexico Street towards Quencer Road, in St. Albans, Queens, when he saw four men about a block ahead of him. One of the men was petitioner Brownridge, and another was in a wheelchair. Tr. 239-40. Brownridge and one of the other men approached Boatwright. Boatwright said, "What's up?" and petitioner responded, "What do you mean, what's up, motherfucker," pulled out a gun and put it to Boatwright's head. Tr. 240-41, 258-59. The other man pulled his gun as well. Tr. 241. Boatwright explained to the men that he didn't have any money and that he was on his way home. Tr. 241. Brownridge put his gun down and started to walk away; the other man, with his gun still drawn, started walking backwards away from Boatwright. Tr. 263-64.

Boatwright did not turn around to leave because he was afraid he would get shot in the back. Tr. 242. He then saw his friend Darryle Adams walking towards the four men, but Adams could not see Boatwright because of a van parked in the street. Tr. 242, 266. As Adams approached the men, one of them pulled out a gun, and Adams put his hands in the air. Tr. 242. Adams got on his knees and started pleading for his life. Tr. 243. The man in the wheelchair rolled over to Adams and hit him in the face with a bottle. Tr. 244. Petitioner then walked up to Adams and shot him in the back of the head. Tr. 244. Boatwright ran home and called Adams' father. Tr. 244, 246.

On March 14, 1994, Boatwright identified Brownridge from a police lineup as the person who shot Adams. Tr. 272, 276. Boatwright also identified petitioner at trial as the man who held the gun to his head and who shot Adams. Tr. 247-48. Boatwright testified that he did not know petitioner before March 7, 1994, and that he had never been in a prior altercation with him. Tr. 290-91.

Quentin Hagood witnessed Adams' murder as well. On March 7, 1994, Hagood was sitting outside at a friend's house on Mexico Street when he saw Adams, whom he knew as Peanut, kneeling down surrounded by a group of people. Tr. 315-18. Hagood saw the man in the wheelchair hit Adams in the head with a bottle. Tr. 317. He then saw petitioner shoot Adams in the back of the head. Tr. 316-18. Hagood and petitioner had gone to school together, Tr. 352, and Hagood knew petitioner by his nickname Mooky, Tr. 318-19. Hagood later identified Brownridge as the shooter during a lineup at the 113th Precinct. Tr. 325.

Police officer Michael Sullivan responded to the scene at 9:00 p.m. Tr. 197-200. He saw Adams lying on his back with blood pouring out of his head and called for the Emergency Medical Service to respond. Tr. 200. Sullivan searched the area and found a hat, a pocket knife, and .380 shell casings. Tr. 203.

Detective Medina responded to the scene after 9:00 p.m. and observed broken glass with liquid on or near it, blood and shell casings on the street. Tr. 414-17. Detective Medina interviewed Boatwright and Hagood, which led him to focus the investigation on petitioner. Tr. 420-21. Detective Medina arrested petitioner on March 14, 1994, one week after the shooting. Tr. 422-23. At the time of his arrest, petitioner said his nickname was Mooky. Tr. 430.

Doctor Jacqueline Lee supervised the autopsy on Adams' body. She testified that Adams had a laceration and fresh bruises and scrapes on his face. Tr. 484-86. Lee identified the cause

of Adams' death as a gunshot wound to the back of the head. Tr. 489. The path of the bullet through Adams' head indicated that the gun was fired from above. Tr. 496, 494.

    ii.   *Petitioner's Case*

Petitioner called three witnesses who testified that they heard a gunshot from inside their homes at around 9:00 p.m. on March 7, 1994. Tr. 525-26, 542-43, 547. They all testified that they waited a few minutes before looking outside and that the only thing they saw was the body of the victim. Tr. 526, 529, 540, 542, 547-48.

Petitioner's father, Samuel Brownridge, Sr., testified that petitioner himself had been the victim of a shooting about six months prior to Adams murder, and that two of petitioner's friends were killed during the earlier shooting incident (the "October shooting"). Tr. 560-61. According to petitioner's father, prior to the Adams murder, Detective Medina had come to his home five or six times to talk to petitioner about the October shooting. Tr. 561-62. Hattie Brownridge, petitioner's mother, also testified that Detective Medina had been to her home prior to the Adams murder. Tr. 565-66. One time, when Detective Medina was in her home, he threatened to put petitioner in jail if petitioner did not cooperate with his investigation into the October shooting. Tr. 572. Mrs. Brownridge also testified that petitioner's friends came to her home all the time and that petitioner did not have a friend who used a wheelchair. Tr. 571. Hattie Brownridge was precluded from testifying about petitioner's whereabouts at the time of the Adams murder, however, because defense counsel failed to file a timely alibi notice.[2] Tr. 463, 514-15.

Petitioner testified in his own defense at trial. According to petitioner, he was not at the corner of Quencer Road and Mexico Street on the night of the Adams murder. Tr. 575. For the reason stated above, petitioner was also precluded from testifying about his alibi. Petitioner

---

[2] As discussed below, petitioner's ineffective assistance of counsel claim is based on counsel's failure to file a timely alibi notice.

stated that he had never owned or shot a gun. Tr. 576. He testified that he had been in a prior verbal altercation with Boatwright on January 6, 1994. Tr. 577-79. Petitioner also testified that, during an incident on October 1, 1993, he was shot and two of his friends were killed. Tr. 582. Brownridge testified that Detective Medina investigated the October shooting and asked petitioner to come to the precinct, but that petitioner refused. Tr. 582-85. At one point, Detective Medina came to petitioner's home and threatened to arrest petitioner if he did not testify about the October shooting. Tr. 586-87. After petitioner's arrest for the Adams murder, Detective Medina visited petitioner in jail and told him that, if he testified against the perpetrators of the October shooting, he would "walk away" on the charge of murdering Adams. Tr. 596.

Detective Medina testified that he did not participate in the investigation of the October shooting, and that it was Detective James Brower who was assigned to that case. Tr. 435. Detective Medina further testified that he never spoke to petitioner about the October shooting, and had never been to petitioner's house or spoken to petitioner's parents prior to petitioner's arrest on March 14, 1997. Tr. 436, 438-39. Medina was unaware that petitioner had refused to testify about the October shooting. Tr. 442. Detective Medina knew petitioner's nickname was Mooky prior to arresting him in March because he had overheard other detectives discussing the October shooting in which Mooky was the victim. Tr. 437-38.

Petitioner was found guilty of intentional and felony murder on April 19, 1995. On May 17, 1995, petitioner was sentenced to two concurrent terms of imprisonment of twenty-five years to life.

B.    <u>Post-Trial State Court Procedural History</u>

Brownridge appealed his conviction to the Appellate Division, Second Department, seeking a new trial. He claimed that his due process right to a fair trial was violated by the prosecutor's summation because the prosecutor denigrated defense counsel, improperly commented on the absence of cross-examination, and appealed to the sympathies of the jurors. The Appellate Division affirmed petitioner's conviction on December 13, 1999, finding that petitioner's prosecutorial misconduct claim was unpreserved for appellate review. *People v. Brownridge*, 699 N.Y.S.2d 897 (2d Dep't 1999). The court also found that "most of the prosecutor's comments were a fair response to statements made in defense counsel's summation . . . [and that] any error was harmless." *Id*. (internal citations omitted). Petitioner then sought leave to appeal to the Court of Appeals. His application was denied on February 17, 2000. *People v. Brownridge*, 94 N.Y.2d 901 (2000).

On August 4, 1999, while his appeal was pending, Brownridge filed a *pro se* motion to vacate his conviction pursuant to New York Criminal Procedure Law Section 440.10. Brownridge claimed that he was denied the effective assistance of counsel because his attorney failed to investigate alibi witnesses that were made known to him and failed to file a timely alibi notice. Petitioner also claimed that the trial court deprived him of his right to present an alibi defense.[3] The Queens County Supreme Court denied Brownridge's motion on August 18, 2000, finding that his claims were procedurally barred for failure to raise them on direct appeal, and that they were, in any event, meritless. *People v. Brownridge*, No. 1094/94 (N.Y. Sup. Ct. Queens County Aug. 18, 2000) [the "8/18/00 Section 440 Decision"].

---

[3] Under New York law, a defendant seeking to assert an alibi defense must file a "notice of alibi" within eight days of a demand for such notice by the prosecution, and the trial court may exclude the testimony of alibi witnesses if timely notice has not been provided. N.Y. CRIM. PROC. LAW § 250.20.

On or about November 13, 2000, petitioner filed a motion to reargue the denial of his

Section 440.10 motion. The state court conducted an evidentiary hearing on petitioner's motion

on several dates in 2003. In addition to testimony about petitioner's alibi defense and the

conduct of his trial attorney, the hearing included testimony from several witnesses alleged by

petitioner to be newly discovered evidence demonstrating his innocence. *See* Hearing Tr. June 9

& 16, 2003; July 7 & 17, 2003; September 16 & 17, 2003. The court denied petitioner's claims

on the merits on August 17, 2004. *People v. Brownridge*, No. 1094/94 (N.Y. Sup. Ct. Queens

County Aug. 17, 2004) [the "8/17/04 Section 440 Decision"]. Brownridge sought leave to

appeal the denial to the Appellate Division,[4] but his request was denied. *People v. Brownridge*,

No. 1094/94 (N.Y. App. Div. 2d Dep't Nov. 20, 2006). Brownridge's habeas petition is dated

November 30, 2006, and it was filed with this court on December 21, 2006.

## AEDPA's Procedural Requirements and Legal Standards

This court's review of Brownridge's petition is governed by AEDPA, 28 U.S.C. § 2254.

Before reaching the merits of Brownridge's claims, I review the procedural requirements

imposed by AEDPA.

A.  Statute of Limitations

AEDPA imposes a one-year limitations period for filing a habeas petition. *See* 28 U.S.C.

§ 2244(d)(1). A conviction becomes final when the ninety-day period following final state court

review for seeking a writ of certiorari to the United States Supreme Court has expired.

*McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir. 2003). Respondent initially brought a motion to

dismiss Brownridge's petition as time-barred. *See* Docket Entry 4. By Order dated September

---

[4] The date on which Brownridge sought leave to appeal is unclear. Although Brownridge contends that his appeal was timely filed, Habeas Pet. ¶ 18, respondent contends that petitioner did not seek leave to appeal until September 11, 2006, more than two years after the underlying decision was rendered, Affidavit in Support of Motion to Dismiss as Time Barred ¶ 8, Docket Entry 4. For the reasons discussed in the text below, I need not resolve this issue.

22, 2008, Judge Dearie denied respondent's motion without prejudice, and directed respondent to address Brownridge's argument that his petition was timely in his opposition papers. Docket Entry 22. In his memorandum in opposition, respondent addressed the merits of Brownridge's habeas petition, but did not reply to Brownridge's argument that his petition was timely filed. *See* Affidavit in Opposition to Petition for Writ of Habeas Corpus ("Opp. Aff.") ¶¶ 39-43, Docket Entry 23.

AEDPA's statute of limitations is an affirmative defense, and is not jurisdictional. *See Day v. McDonough*, 547 U.S. 198, 205 (2006); *Acosta v. Artuz*, 221 F.3d 117, 121-22 (2d Cir. 2000). Because respondent failed to renew his statute of limitations argument in his opposition, I deem respondent's claim that the petition is time-barred abandoned. In any event, because petitioner raises a claim of actual innocence in his petition, the merits of at least that claim must be analyzed *even if* Brownridge's petition was untimely. *See Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004).

B.    Exhaustion

AEDPA requires that habeas petitioners serving state sentences first exhaust all available state court remedies. 28 U.S.C. § 2254(b)(1)(A); *Baldwin v. Reese*, 541 U.S. 27 (2004).

> State remedies are deemed exhausted when a petitioner has: (i) presented the federal constitutional claim asserted in the petition to the highest state court (after preserving it as required by state law in the lower courts) and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim.

*Ramirez v. Attorney General of New York*, 280 F.3d 87, 94 (2d Cir. 2001). Brownridge fairly presented both of his claims to the Appellate Division and to the Court of Appeals for purposes of exhaustion and is therefore not barred from pressing them in this petition.

AEDPA's deferential standard provides that a federal court may not grant a writ of

habeas corpus to a state prisoner on a claim that was adjudicated on the merits in state court

> unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Price v. Vincent*, 538 U.S. 634, 639-40 (2003). Thus, under

AEDPA, a federal habeas court may not issue a writ simply because it decides that the state court

applied Supreme Court precedent incorrectly. *Price*, 538 U.S. at 641. Rather,

> [u]nder the "contrary to" clause, a federal habeas court may grant the writ [only] if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). *See also Henry v. Poole*, 409 F.3d 48, 67-68

(2d Cir. 2005); *Cotto v. Herbert*, 331 F.3d 217, 248 (2d Cir. 2003) (noting that "the objectively

unreasonable standard of § 2254(d)(1) means that [a] petitioner must identify some increment of

incorrectness beyond error in order to obtain habeas relief") (internal quotation marks omitted);

*Lainfiesta v. Artuz*, 253 F.3d 151, 155 (2d Cir. 2001).

A.    Prosecutorial Misconduct

Brownridge first seeks habeas relief on the ground that he was denied a constitutionally

fair trial because the prosecutor made improper comments during his summation. Brownridge's

prosecutorial misconduct claim was rejected by the Appellate Division as both unpreserved for appellate review and, in any event, without merit. *People v. Brownridge*, 267 A.D.2d 318 (2d Dep't 1999). The Appellate Division's ruling constitutes a denial based upon an independent and adequate state law procedural ground that precludes habeas review. *See Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) (holding that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim") (internal quotation marks omitted). The New York Court of Appeals' summary denial of Brownridge's application for leave to appeal does not change the determination that his petition is procedurally barred. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (holding that where "the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits"). Accordingly, Brownridge may not obtain review of his prosecutorial misconduct claim unless he is able to "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law," *Coleman v. Thompson,* 501 U.S. 722, 750 (1991), "or that he is 'actually innocent,'" *Bousley v. United States*, 523 U.S. 614, 622 (1998) (internal citation omitted).

   *i.*   *Cause*

   Brownridge is unable to demonstrate "cause" for his procedural default. Although, as discussed above, Brownridge's attorney failed to object to the prosecutor's summation comments, this failure does not constitute "cause" for the purposes of this analysis. *See Murray v. Carrier*, 477 U.S. 478, 486 (1986). Rather,

> [s]o long as a defendant is represented by counsel whose performance is not constitutionally ineffective . . . cause for a

> procedural default must ordinarily turn on whether . . . some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.

*Id*. at 488. Even when a procedural default is the result of ineffective assistance of counsel, that fact may be used to establish cause only if the petitioner exhausted his ineffective assistance claim in state court. *Id*. at 489. *See also Edwards v. Carpenter*, 529 U.S. 446, 452 (2000) (holding that the specific ineffective assistance of counsel claim "must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default'" (quoting *Murray*, 477 U.S. at 489)). Here, petitioner cannot demonstrate cause on the basis of constitutionally ineffective assistance of counsel because he never argued in state court that his counsel was ineffective for failing to object to the prosecutor's summation comments.

### ii. Prejudice/Lack of Merit

Even assuming "cause" could be shown, Brownridge would still have to establish "prejudice" from his procedural default "by demonstrating that the alleged constitutional error worked to his actual and substantial disadvantage . . . ." *Black v. Herbert*, 2009 WL 1097971, at *10 (S.D.N.Y. Apr. 23, 2009) (citing *U.S. v. Frady*, 456 U.S. 152, 170 (1982)). For the reasons below, Brownridge cannot demonstrate that he suffered any prejudice because his prosecutorial misconduct claim is without merit. *See Cappiello v. Hoke*, 698 F. Supp. 1042, 1052 (E.D.N.Y. 1988), *aff'd*, 852 F.2d 59 (2d Cir. 1988) (finding that "petitioner's procedural default of his claim . . . is prejudicial only if such claim is meritorious").

Improper arguments in a prosecutor's summation violate a defendant's federal constitutional rights only if the impropriety is "egregious," and not mere ordinary error. *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48 (1974)). Moreover, to provide a basis for habeas relief, the prosecutor's misconduct

must have been so prejudicial so as to render the petitioner's trial fundamentally unfair. *United States v. Newton*, 369 F.3d 659, 680 (2d Cir. 2004); *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994); *Floyd*, 907 F.2d at 355. When determining whether prosecutorial misconduct has caused substantial prejudice, courts "consider the severity of the alleged misconduct, any curative measures taken by the trial court, and the likelihood of conviction absent the challenged conduct." *Newton*, 369 F.3d at 680.

Although a prosecutor may not personally vouch for the credibility of a witness, he may properly make arguments to the jury based on evidence in the record in support of the credibility of prosecution witnesses. *See, e.g., United States v. Spinelli*, 551 F.3d 159, 169 (2d Cir. 2008) ("[A] prosecutor is of course entitled to argue forcefully and vigorously to the jury in support of her witness's credibility."); *Newton*, 369 F.3d at 681. Furthermore, "[w]here a substantial portion of the defense summation is devoted to attacks upon government witnesses . . . the prosecutor is entitled to make an appropriate response." *United States v. Clark*, 613 F.2d 391, 405 (2d Cir. 1979). *See also Hirsch v. Plescia*, 2005 WL 2038587, at *6 (E.D.N.Y. Aug. 23, 2005) ("[C]omments made by the prosecutor that defense counsel was misleading the jury or distorting the facts were not overly inappropriate, considering that the prosecutor was responding to similar comments from defense counsel."). Thus, "most Courts of Appeals . . . have refused to reverse convictions where prosecutors have responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray." *United States v. Young*, 470 U.S. 1, 12 (1985) (citing additional case law).

The summation arguments at issue here were not so egregious or prejudicial as to warrant habeas relief. Brownridge first claims that the prosecutor improperly argued to the jury that defense counsel was trying to divert the jury's attention from the real issues in the case.

Petitioner's Brief to the Appellate Division, Second Department, June 1999 ("Pet'r Br. App. Div.") 27.[5]  *See, e.g.,* Tr. 684 (prosecutor's opening remark that "[e]very single thing that was done during the course of this trial . . . was to divert your attention from the evidence").  For example, the prosecutor characterized the testimony of petitioner's parents as an attempt to "inflame [the jurors'] emotions . . . to divert [their] attention from the evidence," Tr. 686, and that defense counsel's argument about the lack of fingerprint evidence, among others, was also designed to "distract [the jurors' attention] from the evidence," Tr. 698-99.  Brownridge also claims that the prosecution repeatedly denigrated defense counsel by referring to his arguments as "silly," "absurd" and a "smokescreen."  Pet'r Br. App. Div. 29; Tr. 684, 686, 688, 698, 705.

There is nothing improper, or even unusual, about a prosecutor arguing that a defense theory is in fact intended as a diversion.  That argument was particularly apt in this case, where the defense—and petitioner, during his testimony, in particular—made suggestions with little or no evidentiary basis.  For example, petitioner suggested during his testimony that Boatwright and Hagood may have implicated him to curry favor with prosecutors in connection with their own criminal cases.  Tr. 598-602.  However, there was no evidence presented at trial that either Boatwright or Hagood had ever been arrested or had any self-interested motive to assist the prosecution.  In addition, as noted above, petitioner and his parents testified that Detective Medina had been involved in the investigation of the October shooting, had threatened petitioner with arrest if he did not cooperate with that investigation, and offered to drop the Adams murder charges against petitioner if he did cooperate.  Detective Medina, in contrast, denied any involvement in the investigation of the October shooting or pressuring petitioner in any way to cooperate with that investigation.  Carrying this defense argument one step further, petitioner's

---

[5] Brownridge does not articulate the basis for his prosecutorial misconduct claim in his memorandum of law in support of his habeas petition.  Accordingly, I have attempted to determine the basis for Brownridge's claim by reviewing his state court submission to the Appellate Division in support of his direct appeal.

attorney referred in his summation to there being "some dirty cops out there" and asserted that

"[t]o have Detective Medina . . . be assigned to Internal Affairs [his assignment at the time of

petitioner's trial] is a scary thing." Tr. 668. These arguments invited the prosecutorial response

they received.

Brownridge next argues that the prosecutor improperly appealed to the sympathies of the

jurors. Pet'r Br. App. Div. 30-31. In support of his argument, Brownridge quotes the following

passage:

> Out of all of the evidence . . . this one point is so strong . . . that
> you'll be able to . . . deliberate and reach a decision in 10 minutes.
> . . . Darryle Adams was loved by his family, by the community and
> by Kevin Boatwright. He was their friend. He was Peanuts. He
> was [Boatwright and Hagood's] buddy. . . . The point is, out of
> everybody in this universe, out of everybody in the world, who
> was the one person that they want brought to justice on this case
> for the shooting of their friend Peanuts, it is the person who shot
> their friend. He was close to them. They have no motive other
> than to bring the person to justice. And each of them said this is
> the person that shot their buddy Peanuts. Who else would they
> want brought to justice except the person who shot their friend[?]
> They have no motive to lie. They have no motive to fabricate.
> They have no motive to bring things up.

Tr. 694-95. Although phrased in somewhat emotional terms, the substance of this portion of the

prosecutor's summation is that Boatwright and Hagood had no reason to accuse petitioner

falsely—an argument petitioner invited when he attacked the motives, and not only the accuracy,

of the eyewitnesses who testified against him.

Lastly, Brownridge points out that the prosecutor incorrectly stated that defense counsel

failed to cross-examine Boatwright about an alleged altercation between Boatwright and

Brownridge in January 1994 about which Brownridge had testified. Tr. 689. *See also* Pet'r Br.

App. Div. 30. This error is more troubling. However, this is not "one of those rare cases where

the improper comments in a prosecutor's summation were so numerous and, in combination, so

prejudicial that a new trial is required." *Floyd*, 907 F.2d at 348, 354-55 (granting habeas relief based upon the "cumulative effects" of the prosecutor's comments, including over forty references to the defendant as a liar even though he did not take the stand, prejudicial comments on the defendant's failure to testify and incorrect statements of law that diluted the state's burden of proof). Rather, the comments here were isolated and brief. *See Wright v. Conway*, 2009 WL 3273901, at *15 (E.D.N.Y. Oct. 9, 2009). Moreover, the trial court mitigated any error by instructing the jurors that it was their recollections of the evidence, and not the recollections of counsel, that should control their deliberations. Tr. 760. Finally, and as discussed below, the evidence against petitioner was sufficient to convict him despite any improper remarks. Thus, even if the comments were "undesirable," it was not unreasonable for the Appellate Division to find that they did not deprive petitioner of a fair trial. *Doran v. Fischer*, 2009 WL 3381537, at *4 (E.D.N.Y. Oct. 20, 2009) (finding that petitioner was not denied a fair trial where the prosecutor demeaned petitioner and misrepresented evidence presented at trial because any ill effects were cured by the court's jury charge and because there was "overwhelming evidence [of petitioner's guilt] independent of those remarks").

iii.   *Actual Innocence*

Even though he is unable to establish cause and actual prejudice, petitioner's default may still be excused if the claimed constitutional error that forms the basis of his habeas petition "'has probably resulted in the conviction of one who is actually innocent.'" *Bousley*, 523 U.S. at 623 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1998)). A claim of actual innocence is not an independent ground for habeas relief. *See Herrera v. Collins,* 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the

underlying state criminal proceeding.").  Rather, Brownridge "may use his claim of actual innocence as a 'gateway,' or a means of excusing his procedural default, that enables him to obtain review of his constitutional challenges to his conviction."  *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004) (quoting *Schlup v. Delo*, 513 U.S. 298, 315-17 (1995)).  As discussed above, however, Brownridge's constitutional challenge to his conviction is without merit.  Moreover, even if Brownridge's prosecutorial misconduct claim were meritorious, I would nevertheless recommend dismissal on the ground that he has failed to overcome his procedural default by establishing that he is actually innocent.[6]

To establish a credible claim of actual innocence, petitioner must provide "'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence . . . .'"  *Doe*, 391 F.3d at 161 (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).  Because the habeas court's concern is with "factual innocence," *Bousley,* 523 U.S. at 623, the court must evaluate all the available evidence without regard to its admissibility, *Schlup*, 513 U.S. at 327-28.  To evaluate whether the new evidence is reliable, the habeas court must consider the evidence "both on its own merits and, where appropriate, in light of the pre-existing evidence in the record."  *Doe*, 391 F.3d at 161 (citing *Schlup*, 513 U.S. at 327-28).  Finally, the habeas court must not

> make an independent judgment of whether reasonable doubt exists, but instead [make] a 'probabilistic determination about what reasonable, properly instructed jurors would do.  This probabilistic analysis must determine 'not merely [whether] . . . a reasonable doubt exists in the light of the new evidence,' but rather whether it is more likely than not 'that no reasonable juror would have found the defendant guilty.'

---

[6] In *House v. Bell*, the Supreme Court held that even if there were a "hypothetical freestanding innocence claim," it would likely require "more convincing proof of innocence than [*Schlup v. Delo*, 513 U.S. 298, 324 (1995)]," which set forth the standard required for a "gateway" claim of actual innocence.  547 U.S. 518, 554-55 (2006). Accordingly, and as discussed below, because petitioner cannot meet the standard in *Schlup*, he would not be able to meet the threshold implied in *House* and *Herrera* to prove a hypothetical freestanding innocence claim.  *See id.*

*Id.* at 163 (quoting *Schlup*, 513 U.S. at 329) (internal citation omitted).

Petitioner bases his actual innocence claim on the accounts of five witnesses, all of whom testified at a post-conviction hearing before the New York State Supreme Court over six days in 2003. At the hearing, petitioner called two alibi witnesses who did not testify as to petitioner's alibi at trial.[7] Hattie Brownridge, petitioner's mother, testified that that she was on the telephone with petitioner, who was staying the house of his then-fiancée, Ruth Bolton, on the night of the murder, from before 8:00 p.m. and until after 9:00 p.m. Hearing Tr. 6, 10, 31-32. Bolton testified that petitioner arrived at her home between 7:30 p.m. and 8:00 p.m. on the night of the shooting and did not leave her home for the rest of the night. Hearing Tr. 141. Bolton stated that her aunt, her cousin and her son were also at the house that night. Hearing Tr. 149. In addition, Bolton, who worked out of her home as a hairdresser, testified that a client came to her home at 8:30 p.m. that night, but could not recall the client's name. Hearing Tr. 140, 142, 166. Although Bolton testified that petitioner's mother called petitioner daily, Bolton could not recall specifically if petitioner's mother called on the night of the shooting. Hearing Tr. 175. This testimony was inconsistent with two affidavits Bolton signed in 1997 and 1999, stating that Hattie Brownridge called at 8:00 p.m. on the night of the shooting. Hearing Tr. 175.

The remaining witnesses were, according to petitioner, unwilling to testify at trial, but testified at the hearing that a man named Garfield Brown, not petitioner, shot and killed Darryle Adams. One of the witnesses, Mark Taylor, had previously stated that petitioner was not the shooter, Hearing Tr. 227, but recanted on the stand, testifying that he was not at the scene of the murder and did not see Garfield Brown shoot someone in St. Albans, Queens, in 1994, Hearing

---

[7] Hattie Brownridge, petitioner's mother, testified at trial, but was precluded from testifying about petitioner's alibi. Ruth Bolton, petitioner's fiancée, did not testify at trial.

Tr. 234-35, 255.[8]  Two of the others, Dean Hoskins and Darryn Lee, stated that they were with

Garfield Brown on the night of the murder and that they witnessed Garfield Brown kill Adams.

Hoskins testified that he became aware back in 1994 or 1995 that an individual, whom he did not

know personally, had been charged with the murder and that it was not Garfield Brown.  Hearing

Tr. 264.  Hoskins explained that he did not identify Garfield Brown as the killer until after

Brown's death in 2002 because of fear.  Hearing Tr. 265-66.  Hoskins denied that Adams was hit

in the face with a bottle before he was shot.  Hearing Tr. 298.  Darryn Lee stated that he was with

Hoskins and Brown on the night of the murder and that Brown was the shooter.[9]  Opp. Aff. ¶ 33.

Lee further stated that Hoskins and Michael Saxton, a friend of petitioner's, encouraged Lee to

come forward with this information after Brown's death to get petitioner out of jail.  *Id.*

Michael Saxton was called as a witness by the state.  Saxton was not at the scene of the

shooting, but learned about it from Mark Taylor and assumed that Garfield Brown was the

shooter.  Hearing Tr. 368, 378.  Saxton further testified that, even though he knew that petitioner

had been arrested and convicted of the murder, he did not tell petitioner that he knew that Brown

was the shooter until after Brown's death.  Hearing Tr. 386.  After Brown's death, Saxton asked

Hoskins to come forward and help petitioner.  Hearing Tr. 381, 387.

In a written decision, the court concluded that there was "no merit to [petitioner's]

claims" and that the new evidence was "not credible and would not be likely to result in a more

favorable verdict to defendant upon a retrial."  8/17/04 Section 440 Decision at 3, 7.  With

respect to petitioner's contention that his trial counsel failed to provide timely notice of his alibi

---

[8]After his arrest in 2002, Mark Taylor told authorities that he knew of someone who was incarcerated for a crime he did not commit.  Habeas Add. Ex. 1.  Taylor apparently identified Garfield Brown as the actual shooter some time later, after Brown died.  Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus, at 34-35 & n.9.

[9] Darryn Lee did not testify at the hearing, but was interviewed in North Carolina by the same assistant district attorney who conducted the Section 440 hearing.  A videotape of the interview was submitted to the hearing court.  Opp. Aff. ¶ 33 & n.5.

defense, the court noted that petitioner's trial counsel testified that he disclosed the alibi witnesses to the court as soon as he learned about them. *Id*. at 4. With respect to petitioner's newly discovered evidence, the court noted that the witnesses who identified Garfield Brown as the shooter did so only after his death when he was unable to refute the allegation and had nothing to lose. In contrast, two eyewitnesses testified at trial and identified petitioner as the shooter. Furthermore, the court questioned the reliability and credibility of those who testified at the hearing. *Id*. at 7.

Viewing the evidence on its own merits, I likewise conclude that it is not sufficiently reliable to support a claim of actual innocence. First, the alibi witnesses—petitioner's mother and, at the time, his fiancée—are closely related to petitioner. Moreover, they did not present a convincing alibi. For example, petitioner's mother testified that she called her son a little before 8:00 p.m. because she wanted to be off the telephone in time to watch the Cosby Show at 8:00 p.m. Hearing Tr. 10. Nevertheless, and although she had seen her son just a few hours before, Mrs. Brownridge—who knew the shooting took place at about 9:00 p.m.—testified that she spent more than an hour on the phone with petitioner. *See* Hearing Tr. 4, 56, 31-32. Bolton testified that petitioner was in her home for the entire evening. She also testified there was at least one disinterested witness in her home that night: her client.[10] However, neither Bolton nor petitioner could remember the client's name. This is especially curious because petitioner was arrested within a week of the murder, at a time when Bolton's and petitioner's recollections would have been clearer, yet there is no record that they ever revealed the client's name.[11] While Bolton

---

[10] Bolton also testified that her aunt, her cousin and her son were home that night. At the hearing, Bolton identified her aunt as Charlene Woodbury, but Woodbury was never called to testify. Bolton also testified that both her cousin and son were under the age of three. Hearing Tr. 149.

[11] At the hearing, Bolton testified that she "probably" told defense counsel her client's name at the time of trial "[i]f he asked" for it. Tr. 166-67.

claimed she remembered that her client arrived on time for an 8:30 p.m. appointment, she could not recall *who* the client was. Tr. 166-67. If, as he claims, petitioner were charged with a murder he did not commit just one week after it took place, and if there were a single disinterested alibi witness, surely petitioner and his fiancée would have immediately contacted that witness and forever remembered the witness' name.

Second, with respect to the exculpatory witnesses, Taylor recanted on the stand[12] and Saxton was not present at the scene of the murder. Hoskins—the only witness who testified in person that he saw Brown kill Adams—had twice been convicted for selling crack cocaine. Hearing Tr. 298-308. In addition, Hoskins' testimony that Adams was not hit in the face with a bottle before he was shot was inconsistent with the testimony at trial that broken glass and liquid were found at the crime scene and that Adams had lacerations on his face at the time of his death. Finally, that these witnesses all named Garfield Brown only after his death, when he was unable to defend himself, is highly suspect and renders their testimony not sufficiently reliable to meet the *Schlup* standard. *See, e.g., Rosario v. Ercole*, 582 F. Supp. 2d 541, 600-01 (S.D.N.Y. 2008) (finding that petitioner's new evidence, consisting of nine witnesses who testified that petitioner was in another state on or around the date of the murder, in contrast to two eyewitnesses at trial, did not satisfy the *Schlup* standard).

Finally, it was reasonable for the jury to conclude that the witness testimony presented by the prosecution was sufficiently reliable to support a guilty verdict. There was no evidence

---

[12] Petitioner contends that Mark Taylor had originally agreed to testify under a grant of immunity offered by the prosecution, but that the court refused to allow it, and instead ruled that Taylor would face perjury charges if he testified that petitioner was not the shooter and that Garfield Brown was the shooter. Habeas Add. Ex. 1. This contention is without merit. According to the hearing transcript, Mark Taylor, who was represented by counsel, did not want to take the stand and indicated that he would testify that he was not at the scene of the crime, even though he had previously stated he was there and that Garfield Brown was the shooter. Nevertheless, petitioner's counsel asked to call Taylor as a witness and the prosecutor agreed. Taylor's counsel asked that Taylor be given immunity and the prosecutor stated that he might agree to immunity on a question-by-question basis. Taylor was eventually called to the stand and, without requesting immunity, was asked whether he was at the scene of the crime, to which he responded no. Hearing Tr. 223-35.

presented at trial that either Boatwright or Hagood had ever been convicted of a crime, or that either had any reason to accuse petitioner falsely. Moreover, they each identified petitioner from a lineup just one week after the shooting. In addition, their testimony about Adams being on his knees when he was shot and having been hit in the face with a bottle was corroborated by the testimony of Detective Medina and Dr. Lee.

In sum, the evidence as a whole does not render it "more likely than not 'that no reasonable juror would have found [petitioner] guilty.'" *Doe*, 391 F.3d at 163 (quoting *Schlup*, 513 U.S. at 327). *See also Cole v. Walsh*, 2009 WL 3124771, at *7 (E.D.N.Y. Sept. 29, 2009) (finding that, even though the state court concluded that petitioner is "probably innocent," the evidence did support a finding that it was "more likely than not that no reasonable juror would vote to convict him"). Accordingly, petitioner has failed to establish a credible claim of actual innocence.

For all of the reasons discussed above, I respectfully recommend that petitioner's claim that he was denied a constitutionally fair trial based upon prosecutorial misconduct be denied.

B. Ineffective Assistance of Counsel

Brownridge next claims that he was denied the effective assistance of trial counsel because his attorney failed to file a notice of alibi, thus precluding petitioner's alibi witnesses from testifying at trial. Brownridge first raised his ineffective assistance of counsel claim on collateral attack. Brownridge's claim was rejected as procedurally barred for failure to raise it on direct appeal and, in any event, without merit. *See* 8/18/00 Section 440 Decision at 3. *See also* 8/17/04 Section 440 Decision at 2-5 (rejecting ineffective assistance of counsel claim on the merits without discussion of the procedural bar).

It is not clear that the Section 440 hearing court properly found that petitioner's ineffective assistance of counsel claim was procedurally barred. A federal court defendant may raise an ineffective assistance of counsel claim on collateral attack, even if that claim could have been but was not raised on direct appeal, without facing a procedural bar. *Massaro v. United States*, 538 U.S. 500, 504 (2003). One reason for the exception to the procedural bar for ineffective assistance of counsel claims is that the factual predicate underlying an alleged error by counsel is often not apparent from the trial record. *Id.* at 504-05. Here, the only information disclosed in the trial record concerning the petitioner's ineffective assistance claim is that his trial counsel failed to file an alibi notice and was therefore precluded from offering an alibi defense. The underlying facts concerning the merits of the alibi defense, and the time when counsel learned about the defense, however, are not part of the trial record. Rather, these facts were developed after trial through affidavits from the alibi witnesses and during petitioner's post-conviction hearing. Without this additional factual development, the alleged deficiencies in counsel's performance could not have been presented on direct appeal. I therefore reach the merits of petitioner's ineffective assistance of counsel claim.

The general standards governing ineffective assistance of counsel claims have long been well-settled. *See Strickland v. Washington*, 466 U.S. 668 (1984). A claim of ineffective assistance requires a showing that counsel was deficient and that the deficiency resulted in prejudice. *Id.* at 687. Counsel's performance must be reviewed objectively and measured for "reasonableness under prevailing professional norms." *Id.* at 688. Moreover, a reviewing court must make "every effort to eliminate the distorting effects of hindsight," and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "might be considered sound trial strategy." *Id.* at 689. Even if counsel was

deficient, the claim may be established only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "It is not enough . . . to show that the errors had some conceivable effect on the outcome" since virtually all of counsel's acts have some effect. *Id.* at 693. Notably, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

Because the hearing court denied petitioner's ineffective assistance of counsel claim on the merits, AEDPA deference applies. Petitioner must therefore demonstrate that the state court's decision was contrary to, or an unreasonable application of, federal law. The Second Circuit has already recognized that New York's test for ineffective assistance of counsel, applied by the state court here, is not contrary to *Strickland*. *See Eze v. Senkowski*, 321 F.3d 110, 123 (2d Cir. 2003). Accordingly, in order to obtain habeas relief, petitioner must show that the state court "'applied *Strickland* to the facts of his case in an objectively unreasonable manner.'" *Id.* at 124 (quoting *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

The hearing court's application of *Strickland* was objectively reasonable. With respect to the performance prong of *Strickland*, petitioner has not shown that his trial counsel's performance was deficient. First, there was conflicting testimony at petitioner's Section 440 hearing with respect to whether petitioner's trial counsel, Michael Mays, was made aware of petitioner's alibi witnesses prior to trial. Mays testified at the hearing that he worked with an investigator on petitioner's case and that the investigator talked to witnesses and spoke with family members. Hearing Tr. 199-201. Mays testified that he believed he first learned about petitioner's alibi after the trial had started and that he immediately informed the court. Hearing Tr. 193. Mays further stated that, had he received information supporting an alibi defense

earlier, he would have promptly filed a notice. Hearing Tr. 205, 218-19. In contrast, petitioner, his mother and petitioner's fiancée all testified that they informed Mays of petitioner's alibi before the trial. *See, e.g.,* Hearing Tr. 6, 77, 94, 166-67. In light of the conflicting testimony, it was not unreasonable for the state court to have credited trial counsel's testimony over the testimony of petitioner and the alibi witnesses. This alone is sufficient to defeat petitioner's ineffective assistance claim.

The state court also concluded that, even if trial counsel had been aware of the alibi defense prior to trial, it would have been a legitimate strategic decision not to pursue it. 8/17/04 Section 440 Decision at 5. *See also* 8/18/00 Section 440 Decision at 5 ("Since the purported alibi witnesses had a close relationship with the defendant, counsel's decision not to call them was apparently strategic, tactful, and legitimate."). "Such strategic choices of trial counsel 'are virtually unchallengeable' in habeas corpus proceedings." *Herion v. Phillips*, 2008 WL 820746, at *24 (E.D.N.Y. Mar. 26, 2008) (quoting *Bonneau v. Scully*, 1991 WL 90739 (S.D.N.Y. May 23, 1991), *aff'd*, 956 F.2d 1160 (2d Cir. 1992)) (internal quotation marks and citation omitted).

The state court's conclusion that it would have been a legitimate strategic decision not to present an alibi defense was not an unreasonable application of *Strickland*. As discussed above, the two potential alibi witnesses were petitioner's mother and his then-fiancée, both of whom were closely related to petitioner and interested in the outcome of his trial. Independent of their interest, they did not, as discussed above, present a strong alibi defense. Moreover, the testimony of the two alibi witnesses contradicted petitioner's testimony at trial that he lived exclusively with his mother at the time of the murder; both alibi witnesses testified that he moved back and forth between their houses during that time period. *Compare* Tr. 593 *with* Hearing Tr. 16-17, 139-140.

In addition, it is clear from the record as a whole that trial counsel provided petitioner with effective representation. Counsel pursued two defenses—misidentification and a police frame up. He cross-examined the eyewitnesses at length, inquiring about their past associations with petitioner, their recollection of the crime scene and their ability to make an accurate identification at night and at a distance from the shooting. Counsel also vigorously pursued the police frame up defense in his opening and closing statements, on cross examination, and through testimony from petitioner and his parents. *See* Tr. 190-96, 277-312, 325-70, 433-61, 560-97, 653-83.

Finally, with respect to prejudice prong of *Strickland*, petitioner has not shown that, but for counsel's failure to present his alibi defense, the outcome of the trial would have been different. For the reasons discussed above, the alibi witnesses would have been subject to vigorous cross-examination on several grounds, enabling the prosecution to argue that the alibi defense was a weak one. Accordingly, it is not likely that the outcome of the trial would have been different had the jury heard the testimony of the alibi witnesses.

In sum, the state court applied *Strickland* to the facts of this case in a reasonable manner. Accordingly, I respectfully recommend that petitioner's claim of ineffective assistance of counsel be denied.

C. Evidentiary Hearing

Brownridge requests an evidentiary hearing. Habeas Pet. at 15. "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). The deferential standards prescribed by § 2254 also govern the habeas court's decision on whether to order an

evidentiary hearing. *Id.* Thus, an evidentiary hearing is not required "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief . . . ." *Id.*

An evidentiary hearing is not warranted in this case. The state court conducted a six-day hearing on petitioner's Section 440.10 motion at which petitioner was represented by counsel and called witnesses relevant to his alibi defense, his claim of actual innocence and his claim of ineffective assistance of counsel. Thus, petitioner was able to fully develop a factual record sufficient for this court to determine whether petitioner is entitled to habeas relief. Accordingly, I recommend that petitioner's request for an evidentiary hearing be denied.

## Conclusion

For all of the reasons stated above, I respectfully recommend that Brownridge's habeas petition be denied in all respects. Any objections to this report and recommendation must be filed within fourteen days of receipt and in any event no later than March 9, 2010. Failure to file timely objections may waive the right to appeal the District Court's order. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 14, 15 (2d Cir. 1989).

_____/s_____

Steven M. Gold
United States Magistrate Judge

DATED:   February 19, 2010
          Brooklyn, New York

A COPY OF THIS REPORT AND RECOMMENDATION WAS SENT ON THIS DAY TO:
Samuel Brownridge
#95-A-3819
Eastern Correctional Facility
P.O. Box 338
Napanoch, NY 12458

U:\IRM 2008-2009\Brownridge v. Miller\brownridge v. miller_habeas_FINAL.docx

26