FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUL 1 5 2010 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SAMUEL BROWNRIDGE
      Petitioner,

  -against-

               **MEMORANDUM & ORDER**

DAVID L. MILLER, Superintendent,   06 CV 6777 (RJD) (SMG)
Eastern Correctional Facility,

      Respondent.
------------------------------------------------------------X

DEARIE, Chief Judge.

  On April 5, 2010, pursuant to an order of this Court extending his time to do so, petitioner Samuel Brownridge filed objections to the Report and Recommendation of Chief Magistrate Judge Steven M. Gold, issued February 19, 2010, recommending denial of petitioner's application for habeas relief under 28 U.S.C.§ 2254 (the "R & R"). Respondent, by letter dated May 3, 2010, responded to the objections, and by letter dated June 10, 2010 and accompanying exhibits, petitioner replied to respondent's response to his objections.

  For the reasons set forth below, the Court adopts the R & R with one minor modification not relevant to the disposition, denies the application for habeas relief, and dismisses the petition.

## I. STANDARD OF REVIEW

  Federal Rule of Civil Procedure 72(b)(3) provides that, when resolving objections to the recommendations of a magistrate judge, the district court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to" and then either "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the

magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3). Accord 28 U.S.C. § 636 ("[a] judge of the court shall make a de novo determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge" or "may also receive further evidence or recommit the matter to the magistrate judge with instructions").

As the Supreme Court instructed some time ago,

> It should be clear that . . . the statute calls for a de novo determination, not a de novo hearing. We find nothing in the legislative history of the statute to support the contention that the judge is required to rehear the contested testimony in order to carry out the statutory command to make the required "determination."

United States v. Raddatz, 447 U.S. 667, 674 (1980). Indeed, the phrase "de novo determination" in section 636 "permit[s] whatever reliance a district judge, in the exercise of sound judicial discretion, ch[ooses] to place on a magistrate's proposed findings and recommendation," provided the district court remains the ultimate decision-maker. Raddatz, 447 U.S. at 676.

## II. PETITIONER'S PRINCIPAL OBJECTION

Petitioner raises four distinctly numbered objections: (1) that Magistrate Gold misapprehended that his due process claim related to the second, rather than the first, of the occasions on which Mark Taylor was to testify at the hearing on petitioner's 440 motion in state court; (2) that Magistrate Gold erred in determining that petitioner had not satisfied the applicable standard for demonstrating a valid claim of actual innocence; (3) that Magistrate Gold erred in determining that the state court had not unreasonably applied controlling Supreme Court law when concluding that petitioner was not denied the ineffective assistance of trial counsel; and (4) that

2

Magistrate Gold erred in concluding that the state court record was sufficiently developed for the Court to determine whether petitioner is entitled to habeas relief without holding an evidentiary hearing.

Although so styled, the four objections overlap and are essentially strands of a single, core assertion at the heart of petitioner's post-conviction claims in the state court and his federal habeas petition: namely, that he is actually innocent of the March 7, 1994 murder of Darryl Adams. His innocence was obscured, he claims, because his trial attorney's failure to file a timely notice prevented the jury from hearing his alibi. His innocence was affirmatively established, he further claims, when several witnesses came forward in 2002, eight years after the Adams murder, and asserted that the recently deceased Garfield Brown, and not petitioner, was the killer. Understandably bolstering petitioner's post-trial proclamations of his innocence is the fact that his second 440 motion in the state court coincided with the state's decision, nearly a decade after the murder of Adams, to re-open its investigation into the case.

For purposes of reviewing the R & R, petitioner brandishes as a sort of smoking gun a portion of the state court record—the 12-page transcript of the proceedings of March 15, 2004, the final day of the hearing on petitioner's 440 motion—that by respondent's concession was not furnished in response to the initial Order to Show Cause in this matter and thus was not before Magistrate Gold. Petitioner insists that the omission materially compromised Magistrate Gold's appreciation of his due process claim with respect to hearing witness Mark Taylor, whose role in the re-opened investigation of the Adams murder was the principal subject of discussion in the courtroom that day. Petitioner also asserts that the omission necessarily undermines the entirety of the R & R, and that when considered de novo by this Court, the formerly omitted transcript both

strengthens the showing of prejudice on his ineffective assistance of counsel claim and tips the scales his way on his claim of actual innocence.

We find to the contrary.

Our examination of the record and of the R & R of course confirms what common sense would suggest: that the absence of the transcript of a proceeding whose principal subject was Mark Taylor necessarily had some effect upon the R & R's treatment of petitioner's claims relating to Taylor. See R & R at n 12. But the effect is inconsequential because we find no merit in petitioner's due process claim with respect to Taylor, nor in any of his claims. To the contrary, as we now explain, the March 15, 2004 proceedings amply corroborate the soundness of the state court's determination that the "newly discovered" exculpatory witnesses were not credible, and therefore serve only to undermine, rather than strengthen, petitioner's claim of actual innocence. Indeed, any veneer of legitimacy apparently bestowed on that claim by the reopening of the Adams murder investigation—which has occasioned the utmost of this Court's de novo review—has long since disappeared.

### III. MARK TAYLOR

Mark Taylor first entered this matter sometime in 2002—seven years after petitioner's conviction for the 1994 murder of Darryl Adams—when he was arrested on drug charges and apparently hoped to bargain for leniency. It was then that Taylor first told police that he knew that an innocent man was in prison for the murder of Darryl Adams. In the ensuing re-opened investigation of the murder, Taylor told both the assistant district attorney and petitioner's post-conviction counsel that he had witnessed the killing of Adams and that it was the just

4

deceased Garfield Brown, not petitioner, who committed the crime. At the eventual hearing on petitioner's 440 motion, however, when called to the stand, Taylor unambiguously denied knowledge of the event. The court, reformulating the district attorney's question, asked, "Mr. Taylor, were you present on the evening when Mr. Darryle Adams was shot?," to which Taylor replied, "No." (Tr. at 235, Sept. 16, 2003). Likewise, after Taylor testified that he knew someone named Garfield Brown, defense counsel asked, "Did you see Mr. Garfield Brown shoot someone in or about, in Queens County, somewhere around St. Albans in 1994, yes or no," and Taylor replied, "No." (Tr. at 255).

Six months later, with the 440 proceeding still pending,[1] Taylor apparently wished to retake the stand to recant that denial and instead offer testimony consistent with the exculpatory accounts he had first given in investigatory interviews. The recovered transcript for March 15, 2004 makes clear that the 440 hearing was re-convened that day for this purpose, but that Taylor did not re-take the stand as planned.

We quote liberally from the transcript because its content and its significance largely speak for themselves. As petitioner's counsel explained to Justice Hanophy,

> Judge, Mark Taylor was brought back down. He is a witness [who] previously testified before the court. I have spoken to him this morning. After speaking with [the assistant district attorney] this afternoon who informed me that his office would be willing to forego any perjury charges in light of the fact that the proceedings are still going on if Mr. Taylor wanted to come in and correct his testimony that he previously gave in light of the fact that Mr. Taylor had spoken with [the assistant district attorney] before and told [the assistant district attorney] a different story and had spoken to me before as well and told me a different story if he wanted to correct the testimony that he gave. (Tr. 2).

---

[1] The 440 hearing took place on six days that spanned a four-month period in 2003 (June 9 and 16, July 7 and 17, and September 16-17).

5

Although the state's willingness to forego perjury charges, and to consent to reconvene the hearing so many months later, arguably implies some endorsement of Taylor's "corrected" version of his testimony, Justice Hanophy saw the matter differently, and announced that if Taylor were to take the stand and change his former testimony, he would urge the state to prosecute Taylor for perjury. As a result, Taylor (who was represented by counsel at the hearing) did not re-take the stand.

Petitioner insists that Justice Hanophy deprived him of due process because his remarks deterred Taylor from offering the exculpatory testimony, but we disagree. The ensuing colloquy shows that Justice Hanophy handled the matter fairly and properly. In the face of defense counsel's zealous arguments about the need for "the truth" to come out, Justice Hanophy astutely observed that Taylor's desire to change his testimony might well have been influenced by the intervening testimony of Mark Hoskins, another potentially exculpatory witness who had also become part of the re-opened investigation; Hoskins had testified immediately after Taylor, at the September 2003 session of the 440 hearing, that he had witnessed Garfield Brown shoot Adams.[2]

The specter hanging over the prolonged 440 proceedings—the horrifying possibility that the wrong man might have been convicted of the Adams murder—was, thanks to defense's counsel's zealous arguments, kept at the forefront of the proceedings on that final day of the hearing. See, e.g., Tr. at 4 ("when the district attorney's office has gone this far over the last two years taking a pro se 440 motion and turning it into an investigation into the homicide and

---

[2] The court remarked that "in between [Taylor's earlier testimony and his desire to recant], somebody else testified to the fact that [petitioner] was not there" (Tr. at 3), and reasoned that, "so he knows that Hoskins said [petitioner] was not there, do you think that might affect his thinking then, oh, wait a minute, I just got up there and I said I was not there, well, now, if I say I was there, don't you think that's going to effect him?" (Tr. at 3-4).

uncovering witnesses and spending money . . . spending hours and hours on this case because they believe there is something [or] there could be something wrong with this conviction"); Tr. at 6 ("I would think the court would be insulted to learn that this court may have sentenced somebody to 25 to life and you will want to find out if somebody made a mistake or lied to you ten years ago when they testified").

It is also clear that Justice Hanophy appreciated the import of the claim before him. He remarked that the state, two years into its re-investigation, had not moved to dismiss the charges, but he also inquired directly of the head of the re-opened investigation, assistant district attorney Richard Schaeffer, whose review of the trial evidence and the results of the re-investigation soundly allayed any concerns that Justice Hanophy, or this Court, may have had about the correctness of the conviction.

Among other things, Schaeffer reported that his interview with the principal trial eyewitness Kevin Boatwright left him "confident that [Boatwright] was speaking of a traumatizing incident that he actually experienced" and that Boatwright "was clearly affected recounting it to [him, the ADA] years after the incident." (Tr. at 10). Schaeffer also stated that, based on his interviews with the new, potentially exculpatory witnesses, he "[did]n't believe any of the witnesses have told the full truth about what was going on here," and further believed that Taylor and Hoskins and the other exculpatory witnesses were probably themselves participants in the Adams murder. (Tr. at 11).

Schaeffer also highlighted a particularly material inconsistency between the new witnesses' supposedly exonerating accounts and the testimony at trial. That inconsistency, on which the state court relied in part in concluding that the exculpatory witnesses were not credible,

7

and on which Magistrate Gold relied in part in concluding that the state court did not make an unreasonable determination of the facts, concerns exculpatory witness Darren Lee. The trial eyewitnesses testified that Adams was shot while on his knees, in front of a man in a wheelchair who struck him with a bottle before petitioner shot him from behind; Lee, in a videotaped interview admitted in evidence at the 440 hearing, stated that he was the individual in the wheelchair, and that he saw Garfield Brown shoot Adams while the two were standing face-to-face. The autopsy report on the victim's skull, however, established that the direction of the bullet was back to front and downward; from the report it was reasonably inferred that, unless the killer shot from a height of approximately eight feet, he must have been standing over and behind a kneeling or seated victim when he committed the murder. Furthermore, while Lee denied that he had struck the victim or anyone with a bottle, that statement conflicted with the account of both trial eyewitnesses (who testified that Adams was struck with a bottle) and with the testimony of police officers that broken glass was found at the scene.

For these and other reasons, the post-conviction court concluded that "the purported new evidence is not credible and would not be likely to result in a more favorable verdict to [petitioner] upon retrial." People v. Brownridge, Ind. No. 1094/94, Order on Motion to Vacate, Aug. 14, 2005 at 7. The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1). Petitioner has offered no evidence to rebut the facially sound credibility determination of the state court. Likewise, the habeas statute provides that petitioner would not be entitled to habeas relief unless that state court's decision "was based on an unreasonable determination of the facts in light of the evidence

8

presented in the State court proceedings." 28 U.S.C. § 2254(d) (2). We find the state court's credibility determinations reasonable, indeed eminently sound, in light of the evidence presented.[3]

We further conclude that petitioner was not denied due process or any other constitutional right by Justice Hanophy on March 15, 2004. The only reasonable view of the supposedly exculpatory evidence offered up to that point was that persons who themselves may have had a role in the killing were seeking to shift the blame to the deceased Garfield Brown. Justice Hanophy acted properly in putting an end to the charade.

For these same reasons, we can find no reason to reject the recommendation of Magistrate Gold, whose analysis is materially indistinguishable from this Court's.[4]

## IV. THE ALIBI WITNESSES AND THE INEFFECTIVENESS CLAIM

The post-conviction court determined that the act or omission of counsel that resulted in the preclusion of alibi testimony did not deprive petitioner of the effective assistance of counsel. People v. Brownridge, Ind. 1094/94, Order on Motion to Vacate, Aug 17, 2004 at 3-5. The only question presented on habeas is whether the state court's decision reflects an unreasonable application of controlling Supreme Court law or an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254 (d).

---

[3] Neither the Supreme Court nor the Second Circuit has yet resolved whether 2254(d)(2) and 2254(e)(1) embody different standards or considerations. See Wood v.Allen, 558 U.S. __, 130 S.Ct. 841, 848 (2010); Green v. Travis, 414 F.3d 288, 299 n. 6 (2d Cir. 2005). See generally Watson v. Ricks, 2010 WL 2346614, *4 (S.D.N.Y. June 2, 2010) (collecting cases). We need not make that determination now as petitioner does not meet either standard.

[4] The foregoing discussion fully disposes of petitioner's two related objections (i.e., those challenging the R & R's finding on his actual innocence claim and the R & R's finding that an evidentiary hearing to allow Taylor to re-take the stand is not necessary to decide the habeas petition).

The post-conviction court did not cite Strickland v. Washington, 466 U.S. 668 (1984), but instead assessed petitioner's claim under New York's "meaningful representation" standard. The Second Circuit, however, has made clear that "the New York 'meaningful representation' standard is not contrary to the Strickland standard," Rosario v. Ercole, 601 F.3d 118, 124 (2d Cir. 2010) (internal citation omitted), but it has also recognized the concern of some jurists that "there may be applications of the New York standard that could be in tension with the prejudice standard in Strickland." Id. (internal citation omitted). Assuming without deciding that it might be necessary to examine petitioner's ineffectiveness claim de novo and directly under Strickland, we readily conclude that the claim does not warrant habeas relief.

Under Strickland, petitioner

> must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

The critical inquiry under the performance prong is "whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688. To establish prejudice petitioner must do more than merely show that the challenged conduct of counsel had "some conceivable effect" on the trial's outcome. Id., 466 U.S. at 693. Instead, he must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A "reasonable probability" is "a probability sufficient to

10

undermine confidence in the outcome." Id.

Finally, Strickland teaches that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

We conclude that regardless of why petitioner's trial counsel did not file a timely notice of alibi as required by New York C.P.L. § 250.20, petitioner did not suffer Strickland prejudice. Petitioner was afforded an opportunity to present his alibi during the 440 hearing; petitioner himself, as well has his mother (Hattie Brownridge) and girlfriend (Ruth Bolton), each testified to the alibi they would have presented at trial. Although the state court, in rejecting the ineffectiveness claim, did not make an explicit finding as to the credibility of the alibi testimony, we have no hesitation in declaring it to be unreliable and unpersuasive, largely for the reasons set forth by Magistrate Gold, whose analysis we find no reason to disturb.[5] The witnesses' interestedness is not what concerns us, and an alibi is not disingenuous merely because it involves family members. But the genuine alibi of an individual accused of a crime he truly did not commit (and one as serious as first degree murder) would not have the factual and logical lacunae exhibited in the testimony of petitioner's witnesses. Cf. Rosario v. Ercole, 601 F.3d 118, 127 (2d Cir. 2010) (affirming denial of habeas relief where, *inter alia*, state 440 hearing court's finding that

---

[5] We note, however, that we are not entirely in agreement with the state court's assessment of what would translate to the "performance" prong of Strickland. The state court acknowledges, as the record plainly reveals, that petitioner's trial counsel testified at the hearing that he learned sometime after the trial began that there was a possible alibi and disclosed this information to the court as soon as he learned it. That testimony is not consistent with the state court's conclusion that "[i]t was defense counsel's *strategy* to pursue a defense of misidentification, rather than to use an alibi defense." Order on Motion to Vacate at 4 (emphasis added). But our determination that petitioner was not prejudiced as a result obviates the need for any formal finding on this point.

11

alibi witnesses were of "questionable" credibility, "[t]ranslated into the language of Strickland," meant that "there was not a reasonable probability that the outcome of the trial would be different but for counsel's errors in not calling those witnesses at trial); Reyes v. Ercole, 2010 WL 2243360, *15-16 (E.D.N.Y. June 1, 2010) (Bianco, J.) (habeas relief denied because, *inter alia*, "the circumstances of the late disclosure [of alibi witness] and the proffered excuse [were] highly suspicious").

## CONCLUSION

For all of the foregoing reasons, the Court adopts the Report and Recommendation of Magistrate Gold issued February 19, 2010, except for its footnote 12, which this Memorandum and Order supplants. The application for habeas relief is denied in its entirety and the petition is dismissed. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
       July 14, 2010

s/Raymond J. Dearie
RAYMOND J. DEARIE
United States District Judge

12